# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| vs. | ) Crim. No. 10-229 |
| | ) |
| BRENT KEVIN HERCULES ANTOINE and JEAN A. SERAPHIN, a/k/a ALLEN DEBROSSE, | ) |
| Defendants. | ) |

## OPINION

Pending before the Court is Defendants'[1] Motion to Suppress [ECF #130], wherein they request the suppression of all evidence obtained arising from, and subsequent to, a traffic stop on March 3, 2010. Defendants further request the suppression of a police officer's identification of Defendant Antoine as one of the occupants of the vehicle in the aforementioned traffic stop. The Government filed an Omnibus Response in which it opposes the suppression motion. (ECF #150). A hearing on the Motion to Suppress was held on August 21, 2012. Defendant Seraphin was not present at the hearing; his counsel stated on the record that his client was expressly waiving his right to be present at the hearing. Sergeant Stephen Fury and Officer Douglas Burek testified credibly at the hearing. For the following reasons, we will deny the motion to suppress in its entirety.

---

[1] The motion to suppress was originally filed by Defendant Antoine, but has been treated as if filed by both defendants given this Court's Orders dated April 30, 2012 where we permitted defendants to adopt each other's pre-trial motions as their own.

**I. Factual Background.**

On the evening of March 3, 2010, a 911 call was placed by an employee of the Walmart store located in Scott Township. The caller told the 911 operator that two (2) black males had been in the Walmart store attempting to purchase gift cards with credit cards that had been rejected and that the name on the identification provided did not match the name on the credit card provided. The caller further stated that one of the men was wearing a plaid coat and the other one was wearing a coat and hat, that the men had just left the store and entered a white Dodge Caravan minivan with a specific Florida license plate number, and that the minivan was leaving the parking lot.

Sergeant Stephen Fury, a patrol officer with the Scott Township police department, responded to the call within a minute or two. He arrived at the Walmart parking lot at 10:06 P.M., saw the minivan about to leave the parking lot and stopped the van. His purpose for stopping the van was to obtain the identification of the individuals in the van and to find out if the credit cards were fraudulent. They had not violated any traffic laws. At the time of the stop, Sergeant Fury had not been told of the type of items the individuals were attempting to purchase at the Walmart or their value.

The location where the van was stopped was lighted by street lights, and there was a traffic signal. Additionally, a McDonald's restaurant, which was located next to where the van was stopped, was lit, and Sergeant Fury's vehicle had its "patrol lighting" and "take down light" on as well.

As Sergeant Fury approached the minivan, for his safety, he illuminated the interior of the minivan with a handheld flash flight. Inside the minivan he saw four men and a black

box/safe in the back of the van, between the two rear passengers. Sergeant Fury testified that there was adequate lighting to observe both the interior of the minivan and its occupants.

Within minutes of his arrival on the scene, Sergeant Fury received backup by fellow Scott Township police officers Douglas Burek, Ballo, and Samangy.

Sergeant Fury asked the driver, Ramar J. Gardiner, for his driver's license, insurance, and the vehicle registration. Mr. Gardiner gave Sergeant Fury a New York license and informed Sergeant Fury that the van was a rental. He produced the rental agreement which showed that the minivan had been rented from Enterprise car rental in Jamaica, NY to a Maribel Cintron ("Ms. Cintron"). Id. Ms. Cintron was the only authorized driver of the rental vehicle and she was not present in the van at the time it was stopped. Additionally, pursuant to the terms of the rental agreement, the van could only be driven in New York, Connecticut and New Jersey.

Once it was determined that none of the drivers were authorized to drive the minivan, Sergeant Fury asked the four occupants to step out of the minivan. Each of the men was then asked for identification. In addition to Mr. Gardiner, who had already provided his identification to Sergeant Fury, the men identified themselves as: (1) Richard G. Foster of Pensacola, FL, (2) Jean Seraphin of Brooklyn, NY, and (3) Brent Kevin Hercules-Antoine of 100 E. 31st Ave. Apt. 518, Brooklyn, NY, with a date of birth of January 10, 1977.

As the men exited the minivan, Sergeant Fury asked them if the box/safe was theirs. No one responded to his question.

Officer Burek questioned the gentleman who identified himself as Brent Kevin Hercules-Antoine. This individual did not present any form of identification. Rather, he orally provided the identifying information to Officer Burek. In the police report authored by Sergeant Fury, and based upon information provided to Sergeant Fury by Officer Burek, this individual was

3

described as being an African-American male with black hair and brown eyes; the police report does not indicate his height.

During the stop, NCIC warrants checks were performed on all of the occupants of the minivan. None of the occupants had any outstanding warrants.

Officer Burek was the police officer who took the information from the man who identified himself as Hercules-Antoine. Officer Burek recalled Mr. Hercules-Antoine to be a slender black male with shorter hair and a height similar to his own or maybe a little taller, who was wearing dark clothing and a coat. He recalled that Mr. Hercules-Antoine may have had a light goatee. Officer Burek has no recollection as to whether or not Mr. Hercules-Antoine had on glasses or had a distinct accent.

Officer Burek's conversation with Mr. Hercules-Antoine was brief, approximately three (3) to five (5) minutes. All Officer Burek did was to get Mr. Hercules-Antoine's information. Officer Burek stood a few feet away from Mr. Hercules-Antoine as they spoke and could readily see Mr. Hercules-Antoine's face. Officer Burek had his flashlight on, but did not shine it on Mr. Hercules-Antoine's face.

As none of the occupants of the minivan were authorized to drive the car, pursuant to Scott Township police department policy, the minivan was impounded, its contents were inventoried on site by Officer Samangy, and the minivan was towed to L. Thomas Auto, the township's towing operator. The occupants were told that the minivan would have to be impounded since they were not authorized to drive it.

The four men left the scene of the stop on foot and walked to the nearby McDonald's. One of the men took a duffel bag out of the trunk of the minivan prior to departing for the restaurant. Total time of the stop was approximately fifteen (15) minutes; Officer Samangy's

4

inventory report indicates that he performed the on-site inventory at 10:16 p.m.

No handcuffs or other physical restraint were used during the stop. There was no spread-eagle positioning or pat down done during the stop. The gentlemen were not free to leave during the course of the stop until told by the officers that they could go. Miranda rights were not given at any time during the stop.

When Officer Samangy inventoried the contents of the minivan, it was determined that the box/safe was locked. Pursuant to the Scott Twp. police department's inventory policy, the officers could not open the locked box/safe; instead, they had to obtain a search warrant, which was granted at 4 P.M. on March 4, 2010.

Additionally, at some point on March 4, 2010, a person identifying himself as Ramar Gardiner called the Scott Township police station seeking return of his black box; the caller was informed by Officer Ballo that he could come to the police station to retrieve it, but he did not do so.

Thereafter, the United States Secret Service ("USSS") took over investigating what had transpired on March 3, 2010 at the Scott Township Walmart store. On or about March 24, 2010, Special Agent Michael Radens of the USSS came to the Scott Township police department. Officer Burek recalls Agent Radens showing him a number of photographs and asking him if he could identify anyone in the photographs. Officer Burek looked at one of the photographs for a few minutes, took it into another room where there was better light, and then told Special Agent Radens that it could be the man he questioned during the stop on March 3, 2012, but that it was not what the man looked like the night of the stop, that it could have been what the male looked like at a different time in his life. Officer Burek did not recall seeing a name on the photograph as he was looking at it.

5

Ultimately, the individual in the picture shown to Officer Burek on or about March 24, 2010 was not Defendant Brent Kevin Hercules Antoine, but another man named Brentt K. Antoine, also from Brooklyn, New York. The similarity of names is quite remarkable.

On January 25, 2011, Officer Burek was shown an arrest/booking photograph by Special Agent Radens. Officer Burek did not recall their exact conversation, and did not recall whether or not Agent Radens showed him more than one photograph. He did remember telling Agent Radens that the photograph he was shown was of the person he had encountered during the March 3, 2010 stop; it was a photograph of Defendant Antoine.

Officer Burek identified Defendant Antoine during the suppression hearing as the man he questioned during the March 3, 2010 stop.

On November 30, 2010, a four-count Indictment was filed against Defendants, Ramar Gardiner and Richard Foster, charging them with conspiracy, possessing fifteen or more counterfeit or unauthorized access devices, and aggravated identity theft. At his initial appearance, Defendant Antoine raised a Rule 5 identity challenge. His challenge was unsuccessful. Ultimately, Mr. Foster pled guilty to Count 1 of the Indictment, the conspiracy charge, and been sentenced.

On February 21, 2012, a five-count Superseding Indictment was filed against Defendants and Mr. Gardiner. Again, they were charged with conspiracy, possessing fifteen or more counterfeit or unauthorized access devices, and aggravated identity theft. Mr. Gardiner has since pled guilty to Count 1 of the Indictment, the conspiracy charge, and been sentenced.

**II. Legal Analysis.**

Defendants request that the Court suppress: (1) "all evidence obtained from the stop and seizure of the van," (2) "all evidence found in the Sentry Lock Box," (3) "all evidence obtained as a result of police questioning and observation on March 3, 2010," and (4) "the identifications by photograph made on March 24, 2010 and January 25, 2011 by police." Motion to Suppress, ¶¶ 37-40. Defendants also request that we "disallow[] any in-court identification by said police." Id. at ¶ 40. In support of these contentions Defendants argue:

> The traffic stop of the van on March 3, 2010 was made without probable cause or reasonable suspicion.
>
> The questioning of the occupants and the viewing of the occupants of the van was based upon an illegal police stop and no Miranda warnings were given by the police.
>
> The confiscation of the van and subsequent search of the van was performed without probable cause.
>
> The search warrant obtained by the police on March 4, 2010 lacked probable cause.
> The identification procedure utilized by the police by photograph on March 24, 2010 and January 25, 2011 was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. (Simmons v. U.S., 377, 88 S.Ct. 967, 19 L.Ed. 2d 1247 (1968).

Motion to Suppress, ¶¶ 20-24 (paragraph numbers omitted).

In response, the Government argues that the initial stop was based on reasonable suspicion that criminal activity was afoot, the defendants were never taken into custody, the defendants do not have standing to challenge the search of the car, the search was a permissible inventory, the defendants abandoned the safe, the evidence contained therein would have been inevitably discovered, the search warrant was supported by probable cause and that there is no substantial likelihood of misidentification. Govt's Omnibus Response, pp. 28-42.

We will address each of the Defendants' arguments in turn.

7

**A. Whether the traffic stop of the van on March 3, 2010 was made without probable cause or reasonable suspicion**.

Defendants' first argument is that all evidence discovered as a result of the stop of the van should be suppressed because the police lacked probable cause or reasonable suspicion to stop the van. Motion to Suppress, ¶ 20. More specifically, Defendants contend "[t]he Fourth Amendment does not allow law enforcement office[r]s to conduct an investigatory detention on the basis of reasonable suspicion that a person committed a misdemeanor that poses no threat to public safety." Id. at ¶ 25 (citing U.S. v. Grigg, 498 F.3d 10 (9th Cir. 2007).

As recently reiterated by the appellate court in Marcavage v. City of Philadelphia, Pa., -- Fed.Appx. --, 2012 WL 1929912 (3d Cr. 2012): "Under Terry v. Ohio, 392 U.S. 1 (1968), and its progeny, 'an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot'. As we noted in United States v. Delfin–Colina, 'only a "minimal level of objective justification" is necessary for a Terry stop'." Id. at *5 (citations omitted). It is also well established that a *Terry* stop is permissible when the criminal act giving rise to reasonable suspicion is a completed felony. United States v. Hensley, 469 U.S. 221, 229, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) ("if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony then a *Terry* stop may be made to investigate that suspicion."). The United States Court of Appeals for the Third Circuit has never held, as argued by Defendants. that the police cannot conduct a *Terry* stop based upon reasonable suspicion that a misdemeanor, as opposed to a felony, has been committed, and we are not convinced that the appellate court would make such a bright-line distinction. Notably, several circuit courts have addressed this issue and refused to adopt the standard articulated by the defendants. See, for example, United States. v. Hughes, 517 F.3d

1013, 1017 (8th Cir.2008) ("[T]his court declines to adopt a per se rule that police may never stop an individual to investigate a completed misdemeanor. To determine whether a stop is constitutional, this court must balance the "nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion.") (citing United States v. Hensley, 469 U.S. 221, 228 (1985); United States v. Moran, 503 F.3d 1135, 1141 (10th Cir.2007) (determining the constitutionality of an investigatory stop of a completed misdemeanor by balancing "the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion") (quoting Hensley, 469 U.S. at 228); but see Gaddis ex rel. Gaddis v. Redford Tp., 364 F.3d 763, 771 (6th Cir.2004) ( "Police may ... make a stop when they have reasonable suspicion of a completed felony, though not of a mere completed misdemeanor.") (citing Hensley, 469 U.S. at 229)).  As the Hughes court explained, "the Supreme Court has consistently "eschewed bright-line rules [under the Fourth Amendment], instead emphasizing the fact-specific nature of the reasonableness inquiry." Hughes, 517 F.3d at 1017 (quoting Ohio v. Robinette, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)).

We find that in determining whether Sergeant Fury's investigatory stop of the minivan was constitutionally permissible, we must balance the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion. Here, a 911 phone call had been received from a Walmart employee who told the police that two men had been in the Walmart attempting to purchase gift cards with credit cards that were being rejected and that the name on the identification did not match that on the credit card, and that these individuals had left the store, and entered a minivan with Florida license plates, and were now exiting the parking lot.  Once stopped, the occupants of the minivan were

only asked for identification and not otherwise questioned, they were not patted down, and the stop lasted less than fifteen (15) minutes. Based upon these facts, we find that the police's interest in finding out the identity of these individuals who may have committed fraud before they left the scene outweighed the limited intrusion to Defendants' personal security. Therefore, the Terry stop did not violate Defendants' constitutional rights.

Defendants' motion to suppress will be denied to the extent it is premised upon the contention that the police lacked probable cause or reasonable suspicion to stop the van in which Defendants Antoine and Seraphin were passengers.

**B. Whether the viewing and questioning of the Defendants was based upon an illegal stop and whether the police's questioning of the Defendants violated their rights under Miranda.**

Defendants next argue that "[t]he questioning of the occupants and the viewing of the occupants of the van was based upon an illegal police stop and no Miranda warnings were given by the police. Motion to Suppress, ¶ 21. The Government responds that "since none of the occupants was ever taken into custody, there was no custodial interrogation necessitating invocation of Miranda warnings. The officers therefore acted lawfully in approaching the minivan, asking questions, obtaining identification." Omnibus Response, p. 33.

Initially, for the reasons already stated, the stop of the minivan was not illegal. Therefore, Defendants' motion to suppress the viewing and questioning of Defendants based upon the stop being illegal will be denied.

With respect to the Defendants' contention that they were questioned during the stop without being given their Miranda rights, at the suppression hearing the only evidence of statements made by Defendants to the police was with respect to their identities, i.e. their names, addresses, phone numbers, and birthdates, and possibly that they were not Marisol Cintron, the

10

only authorized driver of the minivan. To the contrary, Sergeant Fury testified that when he asked the occupants of the minivan whose black box/safe it was, no one answered his question. Under Miranda, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogations of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 436, 444 (1966).

We find that the officers' questioning of the Defendants did not implicate a defendant's right pursuant to Miranda. As explained in Berkemer v. McCarty, 468 U.S. 420 (1984):

> Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose "observations lead him reasonably to suspect" that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to "investigate the circumstances that provoke suspicion." United States v. Brignoni–Ponce, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975). "[T]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation.' " Ibid. (quoting Terry v. Ohio, supra, 392 U.S., at 29, 88 S.Ct., at 1884.) Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of Miranda.

Id. at 439-440 (footnotes omitted). See also Maryland v. Shatzer, 130 S.Ct. 1213, 1224 (2010) (stating "the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop, does not constitute *Miranda* custody.") (citation omitted). Accordingly, Defendants' motion to suppress is denied to the extent it is premised upon the argument that their rights were violated when they were questioned by the police without first being advised of their rights pursuant to Miranda.

**C. Whether the confiscation of the van and subsequent search of the van was performed without probable cause.**

Next we turn to Defendants' contention that the confiscation of the van and subsequent search of the van were performed without probable cause. The Government contends that these Defendants lack standing to challenge the search of the van. Omnibus Response, p. 33. Alternately, the Government argues that the van "was appropriately seized and impounded for an inventory search." Id. at p. 34.

"Standing to challenge a search requires that the individual challenging the search have a reasonable expectation of privacy in the property searched." United States v. Baker, 221 F.3d 438, 441 (3d Cir. 2000) (citation omitted). Thus, in Baker, the appellate court held that:

> [i]t is clear that a passenger in a car that he neither owns nor leases typically has no standing to challenge a search of the car. See Rakas [v. Illinois], 439 U.S. [128,] 133-34, 99 S.Ct. 421 [(1978)] (holding that there is no legitimacy to a defendant's expectations of privacy where the area searched is in the control of a third party). "Fourth Amendment rights are personal rights, which, like some other constitutional rights, may not be vicariously asserted." Id. at 133-34, 99 S.Ct. 421 (quoting Alderman v. United States, 394 U.S. 165, 174, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969)), "a person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." Id. at 134, 99 S.Ct. 421.

Id. at 441-42.

Defendants Antoine and Seraphin neither owned nor rented the van. Nor were they driving the van when it was stopped. As such, we find that they had no legitimate expectation of privacy with respect to the minivan and therefore, lack standing to challenge the seizure and search of the van. In so concluding, we note that while Defendants cite to United States v. Thomas, 447 F.3d 1191 (9th Cir. 2006), in support of their contention that they have standing to attack the confiscation and search of the van, in United States v. Kennedy, 638 F.3d 159 (3d Cir. 2011), the Third Circuit court held that "as a general rule, the driver of a rental car who has been

[l]ent the car by the renter, but who is not listed on the rental agreement as an authorized driver, lacks a legitimate expectation of privacy in the car unless there exist extraordinary circumstances suggesting an expectation of privacy," and in so holding, explicitly rejected the Ninth Circuit court's holding in Thomas to the contrary. Id. at 165.

Defendants' motion to suppress all evidence found as a result of the seizure and search of the van shall be denied based upon Defendants' lack of standing to contest the constitutionality of the search of the van.

**D. Whether the search warrant obtained by the police on March 4, 2012 lacked probable cause.**

Defendants further argue that the search warrant obtained by the police on March 4, 2012 to search "one safe (lock box, 13" x 9 ½", x 5"), Black, Sentry Model 1100, hand held box, no known ownership," lacked probable cause, and therefore, all evidence found in the box must be suppressed. Motion to Suppress, ¶ 23. The Government argues that this part of Defendants' motion to suppress must be denied because these Defendants lack standing to challenge the search of the safe, they forfeited any expectation of privacy by abandoning the safe, the search warrant was supported by probable cause, and even if the search warrant was not supported by probable cause, it was inevitable that the contents of the locked box would have been "inevitably discovered." Government's Omnibus Response, pp. 33-37.

We focus first on whether Defendants have standing to challenge the search of the box/safe. "Standing to challenge a search requires that the individual challenging the search have a reasonable expectation of privacy in the property searched." Baker, 221 F.3d at 441. The defendant bears the burden of proving that he had a legitimate expectation of privacy. Rawlings v. Kentucky, 448 U.S. 98, 104 (1980).

13

Given that no evidence has been introduced from which it can even be inferred that the box/safe belongs to either Defendant, we find that that Defendants have not established that they had a legitimate expectation of privacy in the box/safe and therefore, they lack standing to contest its search or seizure.

Moreover, even if Defendants had established that the box/safe belonged to them, we find that they did not have a reasonable expectation of privacy with respect to the box/safe because they abandoned it. It is well established that there is no reasonable expectation of privacy in abandoned property, and that one who voluntarily abandons property lacks standing to contest its search or seizure. See, for example, United States v. Fulani, 368 F.3d 351, 354 (3d Cir. 2004) ("although a person has a privacy interest in the contents of his personal luggage, . . . he forfeits that interest when he abandons his property") (citations omitted). In determining whether property has been abandoned, the court must make said determination from an objective viewpoint and "[p]roof of intent to abandon property must be established by clear and unequivocal evidence."

Here, proof of Defendants' intent to abandon the box/safe was established by clear and unequivocal evidence. Officer Fury asked the occupants of the van if the box/safe belonged to any of them and neither Defendant Antoine nor Defendant Seraphin responded that the box/safe was his property. Further, Defendants Antoine and Seraphin left the box/safe behind when they left the minivan and neither of the Defendants ever contacted the Scott Township police department after the stop to assert ownership of the box/safe.

Defendants' Motion to Suppress is denied to the extent it is premised upon the contention that the search warrant obtained by the police on March 4, 2012 to search the box/safe lacked probable cause because Defendants lack standing to contest the constitutionality of the search of

the box/safe.

**E. Whether the identification procedure utilized by the USSS on March 24, 2010 and January 25, 2011 violated Defendant Antoine's due process rights because it was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.**

Finally, we address Defendant Antoine's contention that his due process rights were violated by the identification procedure utilized by United States Secret Service Special Agent Radens on March 24, 2010 and January 25, 2011 when he showed photographs to Officer Burek such that Officer Burek's photographic identifications should be suppressed and Officer Burek should not be allowed to identify Defendant Antoine at the trial.[2]

In <u>United States v. Shavers</u>, -- F.3d --, 2012 WL 3641752 (Aug. 27, 2012), the appellate court explained:

> To determine whether an out-of-court identification procedure violated due process, we conduct a two-step inquiry. First, we assess whether the police used an identification procedure that was unnecessarily suggestive. In answering the question of whether [the] identification was impermissibly suggestive, "each case must be considered on its own facts." Even where the police employed an unnecessarily suggestive procedure, however, the identification testimony is not automatically excluded. Instead, as a second step, we engage in a case-by-case analysis of whether the procedure gave rise to such a "substantial likelihood of misidentification" that admitting the identification would be a denial of due process. If so, the identification evidence must be excluded. If, on the other hand, "the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth.

<u>Id</u>. at *14 (quotations and citations omitted).

Thus, we first inquire whether the police used an identification procedure that was unnecessarily suggestive. With respect to the March 2010 identification, Officer Burek recalled

---

[2] After the conclusion of the suppression hearing, Defendant Seraphin filed "Defendant Jean A. Seraphin's Withdrawal of Motion to Suppress Evidence of Photo Identification," in which he stated that he has determined not to challenge the photo identification by Officer Burek. We granted Defendant Seraphin's motion.

15

that Special Agent Radens came to the Scott Township police department, showed him a number of photographs, one at a time, and asked him whether he knew any of the individuals in the photograph. Based upon this testimony, we find that the identification procedure in March 2010 was not unnecessarily suggestive. With respect to the January 2011 identification, Officer Burek recalled that Special Agent Radens came to the Scott Township police department, but could not remember whether Special Agent Radens showed him more than the one photograph, which was a booking/arrest photograph of Defendant Antoine, and could not recall the exact conversation exchange between himself and Special Agent Radens, other than that he remembered telling Special Agent Radens that the photograph was of the person he had encountered during the March 3, 2010 stop. Erring on the side of caution, absent evidence that Officer Burek was shown more than the one photograph, which was of Defendant Antoine, we find that the identification procedure utilized by Special Agent Radens on January 25, 2011, was unnecessarily suggestive.

Having so found, with respect to the January 25, 2011 identification procedure only, we next must "engage in a case-by-case analysis of whether the procedure gave rise to such a 'substantial likelihood of misidentification' that admitting the identification would be a denial of due process." Id. In so determining, our analysis is guided by five factors identified by the Court in Neil v. Biggers, 409 U.S. 188 (1977), namely: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of his prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the amount of time elapsed between the crime and the confrontation. Id. at 199–200. Thus, if in weighing the totality of the circumstances, the "indicators of [Officer Burek's] ability to make an accurate identification" are "outweighed by the corrupting effect" of law enforcement's

suggestion, then the identification should be suppressed and Officer Burek not permitted to identify Defendant Antoine during the trial. Perry v. New Hampshire, 132 S.Ct. 716, 725 (Jan. 11, 2012) (quotations omitted). Otherwise, the evidence should be submitted to the jury. Id.

After consideration of the totality of the circumstances relevant to this issue, we find that because Officer Burek is an experienced and trained police officer who testified credibly that on March 3, 2010, he spoke for three to five minutes to the person who identified himself as being Brent Kevin Hercules-Antoine and could see the subject clearly while they spoke, and that he told Special Agent Radens that the photograph shown on January 25, 2011 was of the man he had stopped on March 3, 2010, that even though almost 11 months had passed since the stop, the photographic identification procedure was not "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Therefore, Defendant Antoine's motion to suppress the photographic identifications made by Officer Burek on March 24, 2010 and January 25, 2011, and to disallow any in-court identification of Defendant Antoine by Officer Burek shall be denied.

**III. Conclusion.**

Defendants' Motion to Suppress shall be denied in its entirety. An appropriate Order follows.

August 30, 2012
s/Maurice B. Cohill, Jr.
Maurice B. Cohill, Jr.
Senior District Court Judge