# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| vs. | )     Crim. No. 10-229 |
| | ) |
| BRENT KEVIN HERCULES | ) |
| ANTOINE and JEAN a. SERAPHIN, | ) |
| a/k/a ALLEN DEBROSSE, | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

### I. Introduction.

Defendant Jean Seraphin ("Mr. Seraphin"), along with three others, was charged in a

Superseding Indictment with one count of violating 18 U.S.C. § 371 (conspiracy), one count of

violating 18 U.S.C. §§ 1029(a)(3) and 2 (possessing fifteen or more counterfeit or unauthorized

access devices), and three counts of violating 18 U.S.C. §§ 1028A(a)(1) and 2 (aggravated identity

theft). A jury trial commenced as to Mr. Seraphin and one other co-defendant, Brent Kevin Hercules

Antoine ("Mr. Antoine"), on September 11, 2012.

On September 14, 2012, at the close of the Government's case during the trial of this matter,

Mr. Seraphin orally moved for a judgment of acquittal pursuant to Fed.R.Civ.P. 29. September 14,

2012 Transcript, p. 107. The Court deferred ruling on the motion. Id. at p. 116. After the jury found

Seraphin guilty as to all five counts of the Superseding Indictment filed against him and Mr. Antoine,

the Court inadvertently failed to rule on the motion. On October 1, 2012, Seraphin timely filed a

renewed motion for judgment of acquittal pursuant to Fed.R.Crim.P. 29(c) ("Renewed Motion").

As to Mr. Seraphin, this was a case built on circumstantial evidence and thus, there is no

doubt that it was a complex case for the jury to consider. Counsel for both the United States and

Mr. Seraphin did an excellent job of focusing the jury's attention on the relevant evidence.

## II. Evidence presented during trial.

Because the evidence presented at trial is crucial to our disposition of the pending Motion, we review it in detail.

### A. Testimony of Scott Township police officer Sergeant Stephen Fury.

Scott Township police officer Sergeant Stephen Fury ("Sergeant Fury"), the first witness to testify at the jury trial, testified to the following information. On March 3, 2010, he was called to the Carnegie/Heidelberg, Pennsylvania Walmart located in the Raceway Plaza as a result of a 911 call placed by Robert Dean, an asset protection employee at the Carnegie/Heidelberg Walmart, which was located in the Plaza, that individuals had been in the store purchasing gift cards with credit cards that were being rejected. September 11, 2012 transcript, pp. 21 and 58. Sergeant Fury also was told that these individuals were in a light-colored Dodge Caravan minivan with a Florida registration plate and that one of the males was a smaller, light skinned, black male wearing a plaid jacket. Id. at p. 21.

When Sergeant Fury arrived at the Plaza, he saw a white Dodge Caravan minivan about to leave the Plaza parking lot. Id. at p. 26. He initiated a traffic stop and approached the white minivan. Id. In the minivan, Sergeant Fury observed four (4) black males. Id. at pp. 27, 31, and 32. One of the males, later identified as Richard Foster, was seated in the front passenger seat; he matched Robert Dean's description. Id. at p. 31. The prosecutor showed Sergeant Fury a photograph of a black male, whom Sergeant Fury identified as being the male who later was identified to be Mr. Foster; the photograph was admitted into evidence. Id. at p. 23. Sergeant Fury observed Defendants Antoine and Seraphin, who were seated in captain chair-style seats behind the driver and front passenger. Id. at p. 32. Antoine was seated behind the driver and Seraphin was seated behind the front passenger. Id. at p. 32-33.

2

Ramar Gardiner ("Gardiner") was driving the van. Id. at p. 27. The prosecutor showed Sergeant Fury a photograph of a black male, whom Sergeant Fury identified as being Ramar Gardiner; the photograph was admitted into evidence. Id. at pp. 27-28.

Gardiner presented Sergeant Fury with a rental agreement that listed the authorized driver as Marisol Cintron. Id. at p. 29. Sergeant Fury determined that none of the four men were authorized drivers of the van. Id. at p. 27. At some point thereafter, he informed the men that the vehicle would have to be towed and an inventory done of the vehicle. Id. at p. 37. He asked them to take any personal property that belonged to them prior to the van being inventoried. Id. The men then exited the van, Seraphin went to the back of the van and removed a fairly large duffel bag, one large enough to fit electronic equipment, a computer, small electronic equipment, and some clothing, and the foursome walked to a nearby McDonald's restaurant. Id. at pp. 37-38.

During the stop, Sergeant Fury observed a rectangular black safe between the center of the rear captain's chairs where Seraphin and Antoine were seated. Id. at p. 36. Prior to the four men exiting the van, he asked the men if the safe belonged to any of them. Id. at p. 37. No one responded to his question. Id. at p. 38.

Upon the police inventorying the contents of the minivan, it was determined that the safe was locked. Id. at p. 39. A search warrant was obtained for the safe. Id. at p. 38. Inside the safe, the police found eleven (11) plastic bags; each bag contained gift cards and receipts. Id. at p. 39. Also found in the safe were thirty-eight (38) credit cards wrapped in a rubber band. Id. The name on each of the credit cards was either "Sean Francis" or "Brandon Anderson." Id. at pp. 39-44.

Sergeant Fury was shown a photograph of a white minivan that was taken in the parking lot of a Giant Eagle grocery store in North Huntingdon, Pennsylvania on March 3, 2010. Id. at pp. 68-69. Sergeant Fury testified that it was similar to the minivan he stopped that night. Id. at p. 69.

### B. Testimony of Scott Township police officer Sergeant Alan Ballo.

Scott Township police officer Sergeant Alan Ballo ("Sergeant Ballo") testified at the trial to the following information. On March 4, 2010, once a search warrant was issued, Sergeant Ballo searched the safe found in the white minivan. September 11, 2012 transcript, p. 115. The safe was locked. Id. at p. 116. Thereafter, Sergeant Ballo received a call from someone identifying himself as Ramar Gardiner, who asked if he could have his box back. Id. at p. 117. Sergeant Ballo informed the individual that he would have to come to the police station to get it; no one ever came to claim the safe. Id. at p. 117.

### C. Testimony of Walmart employee Stephanie Rocco.

Bethel Park, Pennsylvania Walmart customer service manager, Stephanie Rocco ("Ms. Rocco"), testified at the trial to the following information. Ms. Rocco had an encounter with a black male in the Bethel Park, Pennsylvania Walmart store on March 3, 2010 around 8:50 p.m. when she was called over to the customer service desk by a fellow employee because a customer was trying to use credit cards to purchase a $1500 Walmart gift card, the transaction was not going through, and she was needed to cancel the transaction. September 12, 2012 transcript, pp. 6-7, 9. Ms. Rocco canceled the transaction and the customer left the store. Id. at pp. 9 and 15.

The customer was a male wearing a plaid jacket and glasses. Id. at p. 6. The prosecutor showed Ms. Rocco a photograph of a male; she identified the male in the photograph as being the man she dealt with at the service desk. Id. at p. 8.

4

Ms. Rocco had a second, brief encounter with another black male in the store that same night around 9:07 p.m. Id. at pp. 10, 12-13. Bernice Crampton ("Mrs. Crampton"), another Walmart employee who was working at a register that evening, called Ms. Rocco over because a customer was using a credit card to make a purchase and the customer's signature did not match the signature on the card. Id. at p. 10. The customer was a tall thin black male who was wearing a black baseball cap and dark coat. Id. at p. 11. He was attempting to purchase two notebook computers and two (2) iPods, and had tried to use seven different credit cards to make the $2558.25 purchase. Id. at pp. 12-13. All seven credit cards had been rejected. Id. at p. 14.

Ms. Rocco agreed with Mrs. Crampton that the customer's signature, "B. Anderson," did not match the signature on the credit card or the signature on the identification card the customer produced and so she voided the transaction. Id. at pp. 14-15. The customer then left the store. Id. at p. 15.

Because she found the activity of the two males to be suspicious, Ms. Rocco then alerted Walmart stores in West Mifflin, Carnegie, and Washington, Pennsylvania about what had transpired in her store, including giving a description of the two males. Id. at p. 16. At the Carnegie Walmart store she spoke with Darlene Kirsch. Id.

D. Testimony of Walmart employee Bernice Crampton.

Bethel Park, Pennsylvania Walmart employee Bernice Crampton testified at the trial to the following information. A few weeks before coming to court she reviewed a statement that she had made about the events that occurred on March 3, 2010 at the Bethel Park Walmart store, as well as some surveillance images from that evening. September 12, 2013 Transcript, pp. 42-43. She had viewed the video in March 2012, and she remembered what happened on March 3, 2010, two years earlier, without seeing the images. Id. at p. 43.

5

Mrs. Crampton stated that she had recognized a man she saw in the courthouse lobby earlier in the week of the trial as being the man she dealt with at the Walmart store on March 3, 2010; she then identified the man she saw in the lobby to be Antoine as he sat at counsel table. Id. at pp. 43-44. Mrs. Crampton also stated that looking at Antoine in the courtroom stimulated her memory because she had spent time looking at him when he was in the store; "I kind of remembered what he looked like and when I walked in the door and I saw him, I knew immediately it was him." Id. at p. 44.

Mrs. Crampton testified that she was working with Stephanie Rocco the evening of March 3, 2010 when she received a call from the cashier in the electronics department who said he needed help with a gentleman who was trying to purchase electronics and whose credit cards were not going through. Id. at p. 44. The customer then brought his items to the front register and she completed the transaction there. Id. at p. 45. Mrs. Crampton again identified Antoine as the gentleman making this purchase. Id. at p. 45.

The prosecutor showed Mrs. Crampton a receipt; she explained it from the transaction in question. Id. at p. 45. The customer had tried to use six different credit cards to purchase the items. Id. at p. 45. Then, although a seventh credit card the customer tried worked, she voided the transaction after she asked him for identification, and the signature on his out-of-state drivers' license did not match the signature on the credit card he was using. Id. at pp. 46-47. At this point, Mrs. Crampton walked over to the service desk where Ms. Rocco was located, told her what she had done, showed her the two signatures, and Ms. Rocco said "no, absolutely no way are we going to accept that sale." Id. at p. 47. Mrs. Crampton then told the customer of the decision to void the sale. Id.

Mrs. Crampton stated that, in total, her face-to-face encounter with the customer was about 15 to 20 minutes. Id. at p. 47. She described the customer as a black male, taller than her, wearing a baseball cap and a dark jacket. Id. at p. 49. The prosecutor showed Mrs. Crampton a photograph from the Bethel Park Walmart that had been introduced into evidence; she identified the person in the photograph as being the customer she dealt with.

Mrs. Crampton further testified that she was taking the merchandise from the voided sale back where it belonged when she got a phone call from Bob Dean of the Carnegie Walmart who wanted to know what was going on at the Bethel Park store. Id. at p. 49. Mrs. Crampton told him about the encounter she had just had, and described the customer to Mr. Dean: "dark jacket, baseball cap." Id. at p. 49. Mr. Dean told her that he believed that that same customer was at the service desk in his store and he hung up the phone on her. Id. at pp. 49-50.

On cross-examination, Mrs. Crampton stated that she thought that the events at issue occurred in August 2010. Id. at p. 54. She also testified that the cashier in the electronics department who had been assisting this customer was Jarrett. Id. at p. 57. Her recollection was that the merchandise the customer was attempting to purchase was a computer, an iPod, and some computer games. Id. at p. 58. Mrs. Crampton could not recall who was the cashier at the front register where she encountered the customer, but she recalled telling the cashier to ring up the merchandise. Id. at p. 60. Mrs. Crampton also testified that Jarrett had told her that the customer had tried four different credit cards unsuccessfully before they brought the items to the front of the store. Id. at p. 62.

Defense counsel asked Mrs. Crampton what the photograph looked like on the driver's license the customer showed her; Mrs. Crampton said "just looked like him" and indicated to Antoine at counsel table. Id. at p. 70.

Mrs. Crampton also testified that the customer was not by himself; a black male friend was with him. Id. at p. 77. She said the two men left the store together. Id. at p. 78.

Mrs. Crampton explained that she had written a statement about what happened a couple of months after the incident. Id. at p. 80. The statement was given to Special Agent Radens who came to speak to her twice. Id. at p. 82-83. The first time she met with Special Agent Radens, he asked whether she had a description of the customer; he did not show her any photos. Id. at p. 83. Mrs. Crampton told him it was a tall thin black man and that she might be able to identify him. Id. at pp. 83, and 86-87. The second time she met with Special Agent Radens, he showed her two or three photographs. Id. at p. 89. One photograph was of a gentleman in a plaid jacket; she had never seen him before. Id. Mrs. Crampton did not think he was the man who was with the customer she dealt with. Id.

### E. Testimony of Walmart employee Darlene Kirsch.

Carnegie, Pennsylvania Walmart employee Darlene Kirsch ("Ms. Kirsch") testified at the trial to the following information. Ms. Kirsch received a call from Ms. Rocco of the Bethel Park Walmart about suspicious activity that had occurred at the Bethel Park store: specifically, Ms. Rocco told Ms. Kirsch that two black males, tall, lean in composure, one in a white jacket with checkers and the other in a black coat and baseball hat, would come into the store, one would go to electronics and try to obtain high-end items, while the other would try to obtain high dollar gift cards. September 12, 2012 transcript, p. 103.

Ms. Kirsch testified that thereafter, around 9:57 p.m., at the Carnegie store, Ms. Kirsch had an encounter with a male customer wearing a plaid jacket who was trying to purchase two $1500 Walmart gift cards with a Capital One credit card and an out-of-state id. Id. at p. 103, 105. The prosecutor showed a videotape of this transaction to the jury. Id. at p. 105. The

8

videotape showed, and Ms. Kirsch testified to the fact that ultimately, even though the credit card transaction was approved, in the end, the customer decided he did not want to continue with the transaction. Id. at p. 110. Ms. Kirsch explained to the customer that because the transaction was for such a large amount, even though the credit card went through, she needed an override from a manager to complete the transaction. Id. At that point, the customer, who had been texting on his phone throughout the transaction, left the store. Id. Ms. Kirsch then voided the transaction. Id. at p. 111.

Ms. Kirsch testified that during this same time period, another black male customer was in the electronics department trying to purchase iPods and a notebook computer. Id. at p. 112. A sales receipt was admitted into evidence that showed the customer tried to use six credit cards to purchase iPods and an HP computer for $1907. Id. at pp. 113, 116. The prosecutor showed a videotape of this transaction to the jury as well. Id. at p. 114. During the transaction, the customer was texting on his phone. Id. at p. 117.

At some point in time while these events with the two customers were transpiring, Ms. Kirsch alerted Mr. Dean to the events and Mr. Dean followed one of the men out the exit. Id. at p. 120.

F. Testimony of Carnegie, Pennsylvania Walmart employee Bethany Cummings.

Carnegie, Pennsylvania Walmart employee Bethany Cummings ("Ms. Cummings") also testified during the trial to the following information. She was the employee who was working the electronics register when a black male attempted to purchase three iPods and a notebook computer. September 12, 2012 transcript, p. 136. Ms. Cummings testified that the customer tried to pay for the purchase with six different credit cards, none of which worked. Id. at pp. 138, 140. Ms. Cummings asked the customer for identification because his transactions were not

going through; he seemed very suspicious, was very nervous and seemed in a hurry. Id. at p. 138. Ms. Cumming's recollection was that his identification said that his name was "Brian Anderson" or with a "B" and that the identification was from Massachusetts. Id. at p. 139. She also recalled, but was not sure, that the man had a gold tooth. Id. at p. 140. When reminded by the prosecutor that she had written in a statement on or about March 10, 2010, that the customer had a gold tooth, she said that "if it's on the statement then that's correct." Id. at pp. 140-141.

### G. Testimony of Carnegie, Pennsylvania Walmart employee Robert Dean.

Carnegie, Pennsylvania Walmart employee Robert "Bob" Dean ("Mr. Dean") testified at the trial to the following information. Mr. Dean called 911 and followed the male with the plaid jacket out of the store and saw him get into a white minivan which was parked in the Walmart parking lot. September 12, 2012 transcript, pp. 156, 159-160, and 174. Mr. Dean told the 911 operator that they had received a call from the Bethel Park Walmart about suspicious credit card activity and that one of the guys was in his store. Id. at p. 175. That was the only man Mr. Dean saw get into the van. Id. at p. 174. Mr. Dean testified that he could see the license plate of the minivan, which was a Florida plate; he wrote the plate number down on his hand. Id. at pp. 161 and 166. Ultimately, Mr. Dean saw the police stop the van in which he had observed the male entering. Id. at p. 162.

The prosecutor showed Mr. Dean a photograph of a white minivan that was taken in the parking lot of a Giant Eagle grocery store in North Huntingdon, Pennsylvania on March 3, 2010. Id. at p. 165. Mr. Dean testified that the minivan in the photograph looked similar in appearance to the minivan he saw that evening. Id. at p. 165.

H. Testimony of Carnegie, Pennsylvania Walmart employee Tracy Sazewczyk.

Carnegie, Pennsylvania Walmart employee Tracy Sazewzyk ("Ms. Sazewzyk") testified at the trial to the following information. Ms. Sazewzyk is an asset protection manager at the Carnegie store; relevant to the March 3, 2010 transactions, she gathered video and information from the electronic journals at the Carnegie Walmart for the police and provided contact information to the police regarding other Walmart stores. September 12, 2012 transcript, pp. 186 and 189. Ms. Sazewzyk testified with respect to how credit card transactions are conducted at Walmart stores in general. Id. at pp. 190-192. Ms. Sazewzyk also testified at length about an exhibit introduced into evidence by the Government that she had provided the information for; this exhibit listed all of the Walmart stores in the Western Pennsylvania area that on March 3, 2010 had customers attempt to purchase merchandise or gift cards using credit cards in the name of either Brandon Anderson or Sean Francis. Id. at p. 194-214.

The first store Ms. Sazewzyk discussed was the Latrobe Walmart, Store #2052. She explained that a City Bank Visa ending in 3383 in the name of Sean Francis was used to purchase gift cards and a $100 prepaid phone card, for a total of $3104.31. Id. at 195. A Citibank Visa ending in 3383 in the name of Sean Francis was found by the police in the black safe left in the white minivan after Sergeant Fury stopped it as it was exiting the Raceway Plaza parking lot. September 11, 2012 transcript, p. 43. A Walmart signature receipt for the transaction was admitted into evidence. September 12, 2012 transcript, pp. 195-196.

The second store Ms. Sazewzyk discussed was the Greengate Walmart, Store #2059. She explained that at 12:49 p.m. a Visa ending in 7870 in the name of Brandon Anderson was used to purchase American Express gift cards. Id. at 196. A Walmart electronic journal and signature

receipt for the transaction were admitted into evidence; this transaction was for $1478.96. Id. at p. 196.

Ms. Sazewzyk then explained that at 1:15 p.m., also at the Greengate Walmart, a customer attempted at register number 67 to use four Visas, a Visa Platinum ending in 4986, a Visa ending in 3268, an Amazon.com Visa ending in 8191, and a US Bank Visa ending in 1599, to purchase gift cards and an HP notebook computer. Id. at p. 197. That customer then used a Visa ending in 6545 in the name of Brandon Anderson to purchase these gift cards and an HP notebook computer. Id. at p. 197. Walmart electronic journals were admitted into evidence for all of the attempted transactions as well as a Walmart signature slip in the name of B. Anderson was admitted into evidence for the successful transaction. Id. at pp. 197-198. The Visa credit cards ending in 4986, 8191 and 1599, all issued in the name of Brandon Anderson, were found in the safe left in the white minivan. September 11, 2012 transcript, p. 42.

Ms. Sazewzyk next explained that at 1:18 p.m., at the Greengate Walmart, a Visa ending in 3268 in the name of Brandon Anderson was used at register 67 to purchase a candle set, photo albums, spangles, Jordan Almonds, two heart pillows, guest books, favor kits, candy, a cake topper and a candle holder. September 12, 2012 transcript, p. 199. A Walmart electronic journal and receipt for the transaction were admitted into evidence. Id. at. p. 200. That same Visa was then used in a third transaction at register 67, at 1:19 pm, to purchase $1500 worth of gift cards. A Walmart electronic journal and receipt for the transaction were admitted into evidence. Id. at p. 201.

Video surveillance from the Greengate Walmart was admitted into evidence through Ms. Sazewczyk's testimony. One scene was of a white minivan in the store's parking lot. Id. at p. 201-202. The second scene was of the transactions on register 67 where a black male wearing a

white hat and a bluish gray coat can be seen attempting to use and using a number of credit cards to make three purchases. Id. at pp. 201-204.

The third store Ms. Sazewzyk discussed was the West Mifflin Walmart, Store #2281. She explained that at 6:20 p.m. a customer attempted at register number 17 to use four credit cards to purchase V-necks, t-shirts, socks, instant chargers, a magazine and gift cards. Id. at pp. 205 and 230. Three of the credit cards were Visas: (1) a Credit One Bank Visa ending in 7678; (2) a Capital One Visa ending in 2021; and (3) a Capital One Visa ending in 9879. Id at pp. 205-206. Ultimately the customer successfully used a Citibank Visa ending in 4480 in the name of Brandon Anderson to buy the goods. Id. at p. 206. A Walmart electronic journal for the successful transaction was admitted into evidence. Id. The customer then successfully used the Citibank Visa ending in 4480, issued in the name of Brandon Anderson, to buy a $1000 Walmart gift card. Id. at p. 207. A Walmart signature receipt in the name of B. Anderson and an electronic journal for this successful transaction was admitted into evidence. Id. Visas ending in 7678, 2021, and 9879, issued in the name of Brandon Anderson, were found in the safe left in the white minivan. September 11, 2012 transcript, pp. 39-43.

The fourth store Ms. Sazewzyk discussed was the Bethel Park Walmart, Store #5381. She explained that at 8:50 p.m. a customer attempted at register number 92 to use three credit cards to buy 15 gift cards. Id. at p. 205. All three attempts were unsuccessful. Id. at 208. The credit cards involved were two Mastercards ending in 0553 and 7147 and a Capitol One Visa ending in 8428. Id. All were issued in the name of Sean Francis and were found in the safe left in the white minivan. September 11, 2012 transcript, p. 43-44. A Walmart electronic journal for the three unsuccessful transactions was admitted into evidence. September 12, 2012 transcript, p. 208.

Ms. Sazewzyk discussed a second series of transactions at the Bethel Park Walmart. She explained that at 9:07 p.m., a customer attempted at register number 12 to purchase two HP notebooks, three iPods and three (3) PSP games. Id. at p. 209. This customer attempted to use six credit cards before the seventh credit card was approved by the issuing bank. Id. at pp. 208-09. The six credit cards involved that were unsuccessful were Visas ending in 9803, 6398, 4790, 6015, 1374, and 7676. Id. at pp. 209-210. All six of these cards were found in the safe left in the white minivan. September 11, 2012 transcript, pp. 41- 42. A Visa ending with 1612 was the credit card that was approved by the issuing bank; it was issued in the name of Brandon Anderson. September 12, 2012 transcript, p. 210. A Walmart electronic journal for the seven transactions at register 12 was admitted into evidence. Id.

The final Walmart store Ms. Sazewzyk discussed was the Scott Township/Carnegie Walmart, Store #5040. She explained that at 9:57 p.m., a customer attempted unsuccessfully to purchase two $1500 gift cards. Id. at p. 213. A Walmart electronic journal for this transaction was admitted into evidence. Id. She further explained that a customer unsuccessfully attempted six times at register 67 to purchase three iPods and an HP notebook. Id. Ultimately the transaction was aborted and cancelled. Id. This is the transaction that Bethany Cummins testified about at the trial.

I. Testimony of Craig Peterson.

Craig Peterson, Group Vice President for Black Hawk Network, a provider of prepaid cards, i.e. gift cards, testified at the trial that a gift card is a device that can access a specific account. September 12, 2012 transcript, pp. 240-41.

### J. Testimony of Lawrence Hayes.

Lawrence Hayes ("Mr. Hayes"), a law enforcement coordinator for Capitol One Bank, testified to the following information. Mr. Hayes testified that on March 3, 2010, the account numbers of Capital One credit cards issued to Timothy Johns, C. Thomas, V. Marina and G. Meyers were accessed through the use of counterfeit credit cards at Giant Eagle stores in Pittsburgh, Pennsylvania. September 13, 2012 transcript, pp. 5-6. He was then shown 15 credit cards with the name "Capital One" on them; all of these credit cards had been found in the black safe in the minivan. Id. at p. 6. Mr. Hayes explained that all of the cards were counterfeit; he was able to tell because the bank identification number on the cards was not that of Capital One. Id. He also testified that neither Brandon Anderson nor Sean Francis have accounts at Capitol One Bank. Id. at p. 7. Mr. Hayes also could tell the cards were counterfeit because the embossed letters on the card were not embossed deeply enough and part of the letters on the credit card had not been touched with tipping foil. Id. at pp. 9-10.

### K. Testimony of Jim Rozorbil.

Jim Rozorbil ("Mr. Rozorbil"), a Giant Eagle loss prevention employee, testified at the trial to the following information. He participated in collecting video surveillance for a number of Giant Eagle stores from March 3, 2010. September 13, 2012 transcript, p. 11. Mr. Rozorbil explained that he had produced the surveillance videotapes that were Government exhibits GE-64C, GE-73A, GE-9B and A, GE-9C, GE-73B, GE-10, GG-3010, GE-64A and B and GE-81A. Id. at p. 13. Mr. Rozorbil also testified that he provided Michelle DiGiacomo, a fellow Giant Eagle employee, with video taken in Giant Eagle stores on March 3, 2010 that corresponded with a transaction summary that Ms. DiGiacomo prepared. Id. at p. 19.

L. Testimony of Michelle DiGiacomo .

Michelle DiGiacomo ("DiGiacomo"), supervisor of Giant Eagle's retail banking department, testified at the trial to the following information. Ms. DiGiacomo oversees any electronic payments made in Giant Eagle stores. September 13, 2012 transcript, p. 24. Ms. DiGiacomo explained that a manager has to approve any purchase that exceeds $1000. Id. at p. 29.

Ms. DiGiacomo created transaction summaries for purchases made at certain Giant Eagle stores on March 3, 2010, and testified about their contents. The first transaction Ms. DiGiacomo discussed was with respect to the Giant Eagle located in Ligonier, Pennsylvania. Id. at p. 32. There, at 9:39 a.m., a customer used a Visa card ending in 7870, in the name of Brandon Anderson, at the service desk, to purchase six Best Buy Gift Cards for a total of $3000. Id. at p. 32. A Giant Eagle receipt for this transaction was admitted into evidence. Id. at pp. 32-33.

The second transaction Ms. DiGiacomo discussed was with respect to the Giant Eagle located in Latrobe, Pennsylvania. Id. at p. 33. There, at 11:03 a.m., a customer used a Visa card ending in 9809, in the name of Brandon Anderson, at the service desk, to purchase four Best Buy Gift Cards for a total of $2000. Id. A Giant Eagle receipt for this transaction was admitted into evidence. Id. Ms. DiGiacomo then discussed four unsuccessful attempts at the Latrobe store by a customer, using credit cards ending in 9809, 3804, 0634 and 8315, to make a $3000 purchase. Id. at p. 33. Visa cards ending in 3804 and 0634 in the name of Brandon Anderson were found in the black safe left in the minivan. September 11, 2012 transcript, pp. 42 and 44. Finally, Ms. DiGiacomo explained that a Visa credit card ending in 3268 was used at the service desk to purchase six Best Buy Gift Cards for a total of $3000. September 13, 2012 transcript, pp. 33-34. A Giant Eagle receipt for this transaction was admitted into evidence. Id. at p. 34. The signature

16

on the receipt was B. Anderson. Id. at p. 34. Listed on the Giant Eagle receipt were the gift card numbers associated with the six Best Buy Gift Cards. Id. Six Best Buy Gift Cards with the same numbers were found in the black safe left in the minivan. Id. at pp. 34-35.

The next transaction Ms. DiGiacomo testified about occurred at a Get Go located in Latrobe, Pennsylvania. Id. at p. 35. There, at 11:28 a.m., a customer used a Visa card ending in 0634, in the name of Brandon Anderson, to purchase four Visa Gift Cards and four American Express Gift Cards for a total of $549.50. Id. A Get Go receipt and journal transaction for this transaction were admitted into evidence. Id. at p. 36.

The next transactions Ms. DiGiacomo testified about were with respect to a Giant Eagle located in Greensburg, Pennsylvania. Id. at p. 35. There, starting at 12:00 p.m., a customer unsuccessfully tried twice to swipe Visa cards, one ending in 0470 and the other ending in 3383 to purchase six Best Buy Gift Cards for a total of $3000. Id. Visa cards ending in 0470 and 3383 were found in the black safe left in the minivan; the cards bore the name Sean Francis. September 11, 2012 transcript, p. 43. The customer then successfully used a Visa ending in 9177 to purchase the six Best Buy Gift Cards for a total of $3000. September 13, 2012 transcript, pp. 36-37. A Visa ending in 9177, with the name Sean Francis on it, was found in the black safe left in the minivan. September 11, 2012 transcript, p. 43. A Giant Eagle receipt and journal transaction for the successful transaction was admitted into evidence. September 13, 2012 transcript, p. 37.

Video surveillance evidence was admitted into evidence that showed two black males, one with a plaid jacket on and one wearing a baseball cap and tan jacket, entering the Greensburg Giant Eagle as well as the black male wearing the plaid jacket engaged in a transaction that involved a counterfeit credit card. Id. at pp. 41-45.

17

At this same Greensburg, Pennsylvania Giant Eagle, at 12:11 p.m., a customer tried unsuccessfully to use a Visa ending in 3615 to purchase seven Best Buy Gift Cards and five Nordstrom Gift Card for a total of $4004.99. Id. at p. 38. A Visa ending in 3615 was found in the safe left in the minivan. September 11, 2012 transcript, p. 403. The customer then successfully made the purchase with a Visa ending in 6183. September 13, 2012 transcript, p. 38. A Giant Eagle receipt for the successful transaction, signed by B. Anderson, was admitted into evidence. Id.

Again at the Greensburg, Pennsylvania Giant Eagle, at 12:16 p.m. at register 7, a customer tried unsuccessfully to use three Visa credit cards ending in 5529, 9065, and 3615 to purchase four Best Buy Gift Cards and five Nordstrom Gift Card for a total of $2500. Id. at p. 38. Visa credit cards ending in 5529, 9065, and 3615 were found left in the safe in the minivan; the card ending in 5529 bore the name Sean Francis and the other two cards bore the name Brandon Anderson. September 11, 2012 transcript, p. 40-41. The customer then successfully purchased $2500 in gift cards using a Visa ending in 3268. September 11, 2012 transcript, p. 40. A receipt for the successful transaction, signed by B. Anderson, was admitted into evidence. Id.

The next transactions Ms. DiGiacomo testified about were with respect to a Giant Eagle located at Hempfield Square, Pennsylvania. Id. at p. 45. Beginning at 1:45 p.m. a customer tried unsuccessfully three times to use Visa credit cards ending in 5157, 9177, and 5496 to purchase eight Best Buy Gift Cards for a total of $4000. Id. Visa credit cards ending in 9177 and 5496, in the name of Sean Francis, were found in the safe left in the minivan. September 11, 2012 transcript, p. 43. The customer then successfully purchased six Best Buy Gift Cards for a total of $3000 and two Best Buy Gift Cards for a total of $1000, in two separate transactions, using a Visa card ending in 6545. September 13, 2012 transcript, p. 46. A Giant Eagle receipt and

18

electronic display for the $3000 transaction and an electronic display for the $1000 transaction were admitted into evidence. Id. at p. 47.

Video evidence and still photos made from the video taken at the Hempfield Square Giant Eagle were introduced into evidence. Id. at pp. 48-50. These items show two black males in the store, one wearing a Steelers baseball cap and light colored jacket, and the other wearing a plaid jacket; also shown is the male in the plaid jacket engaged in a transaction at the register that involved using counterfeit credit cards. Id. at pp. 49-50. Ms. DiGiacomo testified that the one black male was the same person who had appeared in the video from the Greensburg Giant Eagle, just wearing a different hat. Id. at p. 49.

The next transactions Ms. DiGiacomo testified about were with respect to a Giant Eagle and Get Go located in North Huntingdon, Pennsylvania. Id. at p. 50. Beginning at 4:18 p.m. a customer at the Giant Eagle tried unsuccessfully to use a Visa credit card ending in 3510 to purchase six Best Buy Gift Cards for a total of $3000. Id. at p. 51. The customer then used a Visa credit card ending in 4997 to purchase the cards. Id. A Giant Eagle receipt for the $3000 transaction was admitted into evidence. Id. There were four other declined transactions at that store in the name of Brandon Anderson. Id. at p. 52, 55. Additionally, at 4:42 p.m. a customer at the North Huntingdon Get Go, which is located in the parking lot of the North Huntingdon Giant Eagle store, used a Visa credit card ending in 3251 to purchase washer fluid and six Home Depot Gift Cards for a total of $3003.17. Id. at p. 52. A Giant Eagle receipt for the $3003.17 transaction was admitted into evidence; the receipt was signed by S. Francis. Id.

Video surveillance from the North Huntingdon Giant Eagle and photographs made from the video were admitted into evidence; they showed two black males, one wearing a black jacket

and one wearing a red baseball cap and dark jacket. Id. at pp. 52-55. Ms. DiGiacomo testified that the man in this video was the same man as in in earlier video. Id. at pp. 53-54.

Video surveillance of the parking lot of the North Huntingdon Get Go, as well as a photograph made from the video, was admitted into evidence at the trial; they showed a black male in a plaid jacket. Id. at pp. 55-56. Ms. DiGiacomo testified that the video showed a white Caravan/Dodge minivan pulling into the lot at 4:28 p.m. and an individual who had been seen in other video stills exiting the van. Id. at p. 56. Video surveillance evidence of the transaction at the North Huntingdon Get Go, as well as a photograph made from the video, also was admitted into evidence at the trial; again, they showed a black male in a plaid jacket. Id. at p. 57-58.

The next transactions Ms. DiGiacomo testified about were with respect to a Giant Eagle located in McKeesport, Pennsylvania. Id. at p. 58. Video surveillance evidence from this store, as well as photographs made from the video, showed the same two black males, one in a plaid jacket and one wearing a red and black ball cap and dark jacket, in the store. Id. at pp. 60-61. Beginning at 5:23 p.m., a customer used a Visa credit card ending in 4053 to purchase two Best Buy Gift Cards. Id. at p. 51. A Visa card ending in 4053 in the name of Brandon Anderson was found in the safe left in the minivan. September 11, 2012 transcript, p. 44. A Giant Eagle receipt and electronic display for the transaction were admitted into evidence. September 13, 2012 transcript, p. 59. The electronic display showed that B. Anderson signed for the transaction. Id. There was video surveillance evidence, and a photograph made from the video, admitted into evidence; they showed a dark-colored hand involved in the transaction. Id. at p. 61.

Ms. DiGiacomo testified that there were also declined transactions at the same store on Lane 1. Id. at p. 61. A Giant Eagle electronic display for the transaction was admitted into evidence. Id. It showed that a customer attempted to purchase six Best Buy Gift Cards for a total

of $3000. Id. Video of this transaction, and a photograph made from the video, were admitted into evidence at the trial; they showed the same black male in a plaid jacket as was in earlier videos and photographs. Id. at p. 62.

The next transactions Ms. DiGiacomo testified about were with respect to a Giant Eagle located in West Mifflin, Pennsylvania. Id. at p. 64. Beginning at 6:47 p.m., and ending at 7:09 p.m., a customer tried fifteen times, always unsuccessfully to make purchases with credit cards. Id. at pp. 64-65. The first purchase was an attempt to purchase one Best Buy gift card for $500; a Giant Eagle electronic display was admitted into evidence with regard to this transaction. Id. at p. 65. Two times the customer was able to successfully use a Visa credit card ending in 4480 to purchase Best Buy gift cards. Id. The first time he used the Visa to purchase 4 Best Buy gift cards worth $1500. Id. A Giant Eagle electronic display for this transaction, with the signature of B. Anderson on it, and a corporate generated receipt were introduced into evidence. Id. at p. 66. Video and a photograph of this transaction were admitted into evidence; they showed the customer was a black male wearing a red baseball cap with the number "18" on it and a dark jacket. Id. at pp. 66-68. The second time the customer used the Visa credit card to buy one Best Buy gift card worth $500. Id. at p. 65. At this Giant Eagle store, the total amount of successful purchases was $2000 and total amount of unsuccessful attempts was $21,500. Id. at p. 68.

The last four transactions Ms. DiGiacomo testified about were with respect to a Giant Eagle store located in Brentwood, Pennsylvania and Giant Eagle store located in Caste Village, Pennsylvania between 7:40 p.m. and 8:20 p.m. Id. at p. 69. All of the transactions were unsuccessful. Id. A Giant Eagle electronic display was introduced into evidence for one of the unsuccessful transactions; it was for an attempt to buy five (5) Best Buy gift cards for a total of

$2500 using a Visa ending in 4790 in the name of Sean Francis. Id. The transaction was declined and the order cancelled. Id.

Finally, Ms. DiGiacomo testified that at all eleven of the Giant Eagle stores she testified about, the credit cards used were either in the name of B. Anderson or S. Francis. Id. at p. 88.

M. Testimony of Douglas Burek.

Douglas Burek ("Officer Burek"), a Scott Township police officer, testified at the trial to the following information. Officer Burek was one of the police officers involved in the stop of the white minivan at the Raceway Plaza in Carnegie on March 3, 2010. September 13, 2012 transcript, p. 135. The prosecutor showed Officer Burek a photograph of a white minivan in the parking lot of the Walmart in Greensburg; Officer Burek testified that it looked similar to the minivan he stopped in Carnegie. Id. With respect to the stop of the minivan, Officer Burek testified that the area was well-lit where the van was stopped and that he took Brent Kevin Hercules Antoine out of the van. Id at pp. 137-138. Officer Burek also testified that he recognized Defendant Seraphin at the defense table in the courtroom as one of the male passengers in the back of the minivan. Id. at p. 138. Officer Burek then testified that the person he removed from the van was the defendant Antoine that was seated at defense table. Id.

Officer Burek explained that later in March, 2010, Special Agent Radens showed him several photographs at his police headquarters. Id. at p. 144. Officer Burek showed Special Agent Raden one of the photos and told him that he could not say for sure whether that was the individual he dealt with during the traffic stop; the individual in the picture could have been the male he took identification from during the stop on March 3, 2010 maybe at a different time in that man's life, but that he could not be sure. Id. at p. 145. The name Antoine, Brentt, K. was on the photograph he identified. Id. at p. 146.

Officer Burek also testified that in January 2011, Special Agent Radens showed him one photograph; Officer Burek immediately identified the man in the photo as being the man he dealt with on March 3, 2010. Id. at p. 147. The photograph was admitted into evidence. Id. at p. 148.

### N. Testimony of Special Agent Jon Ferris.

Jon Ferris ("Special Agent Ferris"), a Special Agent for the United States Secret Service, testified at the trial to the following information. Special Agent Ferris testified that he recognized Defendant Seraphin at the defendant counsel table from an incident at the Peace Bridge which connects New York to Canada on November 15, 2010. September 13, 2012 transcript, p. 211. Special Agent Ferris had responded to a call that there were three individuals who had attempted to cross the border, they had been following a GPS , and that a border search had occurred on the Canadian side where merchandise was found without receipts. Id. at p. 212. The three men in the car were Ramar Gardiner, Mark Daniel, and Jean Seraphin. Id. at p. 213. Special Agent Ferris went to the Peace Bridge and found out that Mark Daniel was in possession of five counterfeit credit cards. Id. Ramar Gardiner was the driver of the car. Id. at p. 214.

Found in the car were bags of merchandise, including iPads and iPods, that were still wrapped in original packaging. Id. at pp. 214-215. Also found in the car was an iPhone box with accessories but no phone, one charging cable, nine gift cards that had been used, miscellaneous strips of banking information and googled locations of Walmarts in New York, a GPS, a digital camera, 33 gift cards that were each worth $100, three iPads, four (4) iPod Touches still in original wrapping, five Xbox games, one DVD, one Xbox 360 connect game, two (2) lap top computers, approximately ten cell phones, and two counterfeit checks that had been torn up. Id. at pp. 216-17, 220, 235. There were also receipts for clothing, but they did not match any of the

items in the car. Id. at p. 217. A banking document, in Mr. Seraphin's name, was also found in the car. Id.

Special Agent Ferris explained that Mr. Seraphin was charged by the Buffalo police with possession of a forged instrument related to the checks, as was Mr. Gardiner, but the charges were dismissed. Id. at pp. 221, 223. Mr. Daniel was convicted of possession of a forged instrument for the counterfeit credit cards found in his possession at the time of the search. Id. at p. 223.

Defense counsel for Mr. Seraphin questioned Special Agent Ferris about three Custom and Border Control documents. Special Agent Ferris explained that these documents indicated that the two laptops seized were the property of Ramar Gardiner, who admitted they were his, and not Jean Seraphin, and that the phones, fraudulent credit cards and shredded checks seized were the property of Mark Daniel. Id. at p. 227, 230-231.

The Court then instructed the jury that Mr. Seraphin was not charged with any crime with respect to any of the items discussed by Special Agent Ferris, that it was admitted only for the purpose of helping the jury determine whether Mr. Seraphin had any relationship with Mr. Gardiner and whether Mr. Seraphin had the state of mind or the knowledge or the intent necessary to commit the crime of conspiracy in the case they were deciding, that being from February 18, 2010 to March 3, 2010, and that this stop occurred the following November; "he is not on trial for committing these particular offenses." Id.at pp. 220-221.

On redirect, Special Agent Ferris explained there was no federal prosecution or further prosecution in New York against Mr. Seraphin since he was being prosecuted in this case in the Western District of Pennsylvania. Id. at p. 235.

O. Testimony of Special Agent Michael Radens.

Michael Radens ("Special Agent Radens"), a Special Agent for the Homeland Security Investigations and the case agent for this case, who formerly was a Secret Service agent, testified at the trial to the following information. Special Agent Radens testified that they took one of the credit cards found in this case and swiped it through a card reader and found that the numbers on the front of the card were the same as on the magnetic strip on the back of the card, which meant that the card was counterfeit. September 14, 2012 transcript, p. 18.

Special Agent Radens further testified that the credit cards admitted into evidence are all counterfeit. Id. at pp. 23-24. He explained that he knew they were counterfeit because the bank identification number was not correct on the cards, the hologram placement was wrong, and the foiling was incorrect. Id.

Special Agent Radens also testified about a certified copy of a marriage license from New York that stated that Mr. Antoine was married on March 5, 2010. Id. at p. 26. A wedding photograph of Antoine was admitted into evidence; Agent Radens testified that he could see something shiny in Antoine's mouth in the picture. Id. at p. 27.

Special Agent Radens further testified that Mr. Antoine's birthdate is January 10, 1977 and that he is five (5) feet nine (9) inches tall. Id. at pp. 27, 50-51.

Special Agent Radens also testified that when he first saw the videos introduced throughout the trial from the various Walmart and Giant Eagle stores, he thought there were four different individuals in the video: Richard Foster, who was wearing the plaid coat, and then three other individuals. Id. at p. 38. But after he watched the videos over and over again, he came to the conclusion that there were only two individuals in the videos, and that the second male just continued to change his appearance in the store. Id. at pp. 38-39. He determined that it was the

25

same gentlemen in the various videos because the man's jeans and shoes did not change and it was the same basic goatee in every video. Id. at p. 39.

Special Agent Radens testified that they did not fingerprint the safe left in the minivan because it is rigid and they cannot get a fingerprint from a rigid item. Id. at p. 40. They tried fingerprinting one credit card; it was analyzed and there were no identifiable fingerprints on the card. Id. at p. 41. Special Agent also testified, on cross examination, that it was not one of his duties to examine fingerprints; "there are experts for that." Id. at p. 20.

Special Agent Radens testified that the photograph shown to the grand jury was not of Mr. Antoine, but of another individual, Brentt K. Antoine, who also resided in Brooklyn, New York. Id. at p. 70.

Special Agent Radens also testified that when, on January 25, 2011, he showed Officer Burek, the photograph of Mr. Antoine taken at the time of his arrest earlier in January, 2011, Officer Burek said that he was the guy Officer Burek had dealt with. Id. at p. 88.

Special Agent Radens testified that in March 2012 he showed Mr. Antoine's arrest photograph to Bernice Crampton, the Bethel Park Walmart employee, and she then told him that was definitely the man she dealt with on March 3, 2010. Id. at pp. 93-94.

Special Agent Radens testified that Seraphin is not in any of the videos from March 3, 2010. Id. at p. 104. He also testified that there were smooth surfaces on the safe around the place where you open the safe (right above the lock) and on the inside top lid of the safe. Id. at p. 106.

P. Stipulated Facts.

The parties stipulated to the following facts. First that if called as a government witness, Richard Boland, a senior field investigator with Citibank, would testify that government exhibits 2, 6, 9, 11, 25 and 26 are fictitious credit cards with Citibank customer account numbers, that the

accountholders are real victims with both attempts or losses as reflected in the summary chart entered into evidence, and that the accounts were accessed at accounts in Sioux Falls, South Dakota. September 14, 2012 transcript, p. 131. Second, that if called as a government witness, Steven Lenderman, special investigator for Barclays Bank, would testify consistently with the summary chart, that government exhibits 15, 30, 34, and 36 are fictitious credit cards with Barclay customer account numbers, that the accountholders are real victims with both attempts and losses as reflected in the summary chart, and that the accounts were accessed at accounts in Wilmington, Delaware. Id. at p. 131. Third, that if called as a government witness, Eric Pyle, fraud investigator for Bank of America/FIA Card Services, would testify consistently with the summary chart, that government exhibit 124 is a fictitious credit card with a Bank of America customer account number, that the accountholders of that card as well as accounts ending in 5126 and 9809 are real victims with both attempts and losses as reflected in the summary chart, and that the accounts were accessed at accounts in Wilmington, Delaware. Id. at pp. 131-132. Fourth, that if called as a government witness, Linda Fales, vice president of risk management for Suncoast Schools Credit Union, would testify consistently with the summary chart, that government exhibit 39 is a fictitious credit card with a Suncoast Schools Credit Union account number, that the accountholder is a real victim with a loss as reflected in the summary chart, and that the account was accessed at an account in Tampa, Florida. Id. at p. 132.

The parties also stipulated that: (1) "GG" identified in Count 3 of the superseding indictment is Gerald Golis, a real person, owning a Barclay's Bank account number ending in 9117, and that if called as a witness, Mr. Golis would testify that the use of his account number at a Giant Eagle store on March 3, 2010, was unauthorized; (2) "MG" identified in Count 4 of the superseding indictment is Mark Cotton, a real person, owning a Citibank account number

ending in 3615, and that if called as a witness, Mr. Cotton would testify that the use of his

account number at a Giant Eagle store on March 3, 2010, was unauthorized; and (3) "GF"

identified in Count 5 of the superseding indictment is Garrie Fanning, a real person, owning a

Bank of America/FIA Bank account number ending in 9809, and that if called as a witness, Mr.

Fannie would testify that the use of his account number at a Giant Eagle store on March 3, 2010,

was unauthorized. Id. at pp. 132-133.

Q. Exhibits HSI-1 through HSI-3.

Mr. Seraphin did not introduce any testimony during the trial, but he did have the three

Customs and Border Patrol documents his counsel questioned Special Agent Ferris about

admitted into evidence. September 14, 2012 transcript, pp. 129 and 133. Again, the three

documents, which were related to items seized from the car during the Peace Bridge stop in

November 2010, were: (1) a custody receipt from the Customs and Border Patrol for a Dell

laptop computer which stated the computer was taken from Mr. Gardiner; Mr. Gardiner told the

authorities it was his computer; (2) a custody receipt from the Customs and Border Patrol for an

HP Pavilion laptop computer which stated the computer was taken from Mr. Gardiner; again,

Mr. Gardiner told the authorities it was his computer; and (3) a custody receipt from the Customs

and Border Patrol for numerous cell phones, five possible fraudulent credit cards, and shredded

checks which stated the items were taken from Mr. Daniel. September 13, 2012 transcript, pp.

226-231.

**III. Standard of Review.**

In U.S. v. Caraballo-Rodriguez, 2013 WL 4017157 (3d Cir. Aug. 8, 2013), the appellate

court explained the applicable standard of review when a motion for judgment of acquittal is

premised upon the argument that there is insufficiency of the evidence to convict:

We have set forth the appropriate standard in a sufficiency of the evidence challenge many times. We "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt[ ] beyond a reasonable doubt." [U.S. v.] Brodie, 403 F.3d [123,] 133 [(3d Cir. 2005)] (internal quotation marks and citation omitted). Under this particularly deferential standard, we "must be ever vigilant not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury." Id. Furthermore, "we review the evidence as a whole, not in isolation, and ask whether it is strong enough for a rational trier of fact to find guilt beyond a reasonable doubt." [U.S. v.] Boria, 592 F.3d [476,] 480 [(3d Cir. 2010)]. We must sustain the jury's verdict "if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision." United States v. Gambone, 314 F.3d 163, 170 (3d Cir. 2003) (internal quotation marks omitted)

Id. at *11. Thus, the standard for granting a motion for judgment of acquittal based on insufficient evidence to sustain a conviction is quite stringent. United States v. Soto, 539 F.3d 191, 194 (3d Cir. 2008). The defendant bears a heavy burden of demonstrating that relief is appropriate, and the granting of relief under Rule 29 is "confined to cases where the prosecution's failure is clear." United States v. Leon, 739 F.2d 885, 891 (3d Cir.1984) (citing Burks v. United States, 437 U.S. 1, 17 (1978)). See also United States v. Mercado, 610 F.3d 841, 845 (3d Cir. 2010) (citing Soto, 539 F.3d at 194) ("[A]n insufficiency of the evidence claim places a heavy burden on the [challenger] because [the court] will only find the evidence insufficient when the prosecution's failure is clear."); United States v. Starnes, 583 F.3d 196, 206 (3d Cir. 2009) (internal quotation marks omitted) (burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high).

The standard of deference applicable when reviewing motions for judgment of acquittal "is especially important when reviewing a conviction of conspiracy, because a conspiracy, by its very nature, is a secretive operation, and it is unlikely that the co-conspirators will set forth the details of the conspiracy." United States v. Nagle, 2013 WL 3894841, *43 (M.D. Pa. July 26, 2013) (citing Brodie, 403 F.3d at 134). "In a conspiracy case we must closely scrutinize the

Government's evidence because (1) slight evidence of [a defendant's] connection to the conspiracy is not sufficient to support guilt, and (2) guilt must remain individual and personal." Boria, 592 F.3d at 480 (citing Brodie, 403 F.3d at 134). That said the elements of a conspiracy may be proven beyond a reasonable doubt "with direct or circumstantial evidence" and "[c]ircumstantial inferences drawn from the evidence must bear a 'logical or convincing connection to established fact'." Caraballo-Rodriguez, 2013 WL 4017157 at *6 (citations omitted).

**IV. Legal Analysis.**

A. Count 1 of Superseding Indictment - Conspiracy.

The first basis for Mr. Seraphin's renewed motion for judgment of acquittal is that the government did not present sufficient evidence for the jury to conclude that he was a member of the criminal conspiracy to commit access device fraud charged in Count One of the Superseding Indictment. Renewed Motion, ¶¶ 59-70. See Id. at ¶ 69 ("At trial . . . the government failed to present evidence of anything more than Mr. Seraphin's presence on March 3, 2010, and some undefined association with others in the vehicle that was stopped. Such evidence is insufficient to establish participation in a conspiracy."). Mr. Seraphin further argues with respect to the government's lack of proof as to his involvement in the charged conspiracy that "the Peace Bridge traffic stop did nothing to establish his intent to participate in a conspiracy or illegal activities on March 3, 2010 (8 months later), particularly given that all of the suspicious items were taken from individuals other than Mr. Seraphin" and "[a]lthough the Court instructed the jury that they could not use the 404(b) evidence of the Peace Bridge traffic stop as evidence of bad character or evidence of guilt of the charged crimes from February 18, 2010 to March 3, 2010, under the circumstances, there is a high likelihood that this evidence was used by the jury as character evidence against Mr. Seraphin." Id. at ¶¶ 59 and 70.

In response, the government contends that there was sufficient evidence presented for a rational juror to conclude that Mr. Seraphin agreed to participate in the credit card fraud conspiracy on March 3, 2010. United States' Response, pp. 3-13.

Turning first to Mr. Seraphin's Rule 404(b) argument concerning the Peace Bridge traffic stop, "[t]he remedy for [an] erroneous admission of Rule 404(b) evidence, . . . is a direct appeal or a motion for a new trial, not a motion for a judgment of acquittal. United States. v. Lespier, 2012 WL 1032693, *5 (W.D.N.C.) (citing United States v. Luna, 21 F.3d 874, 883 (9th Cir.1994)). Accordingly, Defendant's renewed motion for judgment of acquittal is denied to the extent it is premised upon any error by this Court with respect to the Rule 404(b) evidence it ruled admissible at trial.

Returning to Mr. Seraphin's contention that the government did not present sufficient evidence for the jury to conclude that he was a member of the criminal conspiracy to commit access device fraud charged in Count One of the Superseding Indictment, it is well established, and the jury was so charged in this case, that in order to establish a violation of 18 U.S.C. § 371, the government must prove all of the following essential elements beyond a reasonable doubt: (1) that two or more persons agreed to commit offenses against the United States, as charged in the indictment; (2) that the defendant was a party to or member of that agreement; (3) that the defendant joined the agreement or conspiracy knowing of its objectives to commit offenses against the United States and intending to join together with at least one other alleged conspirator to achieve those objectives; that is, that the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve common goals or objectives, to commit offenses against the United States; and (4) that at some time during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further the objectives of the agreement. See also Caraballo-Rodriguez, 2013 WL 4017157 at *6 (court

stated: "to prove a conspiracy, the government must show: (1) a shared unity of purpose; (2) an intent to achieve a common illegal goal; and (3) an agreement to work toward that goal" and with respect to the required "intent to achieve a common illegal goal," explained that "'knowledge' can be demonstrated by actual knowledge or willful blindness." (citing Brodie, 403 F.3d at 148 ("The knowledge element ... may be satisfied upon a showing beyond a reasonable doubt that a defendant had actual knowledge or deliberately closed his eyes to what otherwise would have been obvious to him concerning the fact in question.").

Mr. Seraphin correctly states that neither mere knowledge of a conspiracy nor mere presence at the scene of the illegal acts is sufficient evidence from which a juror may infer membership in a conspiracy. See United States v. Tyson, 653 F.3d 192, 210 (3d Cir. 2011) (holding defendant's mere presence at scene is insufficient evidence of membership in a conspiracy). In this case, however, viewing the evidence in the light most favorable to the Government, there was evidence introduced at trial from which any rational trier of fact could have found proof beyond a reasonable doubt of Mr. Seraphin's knowing and intentional participation in the conspiracy charged in the Superseding Indictment, i.e. to use counterfeit credit cards on March 3, 2010 to buy gift cards and other merchandise.

In particular, the evidence showed that all four of the men found in the minivan when it was stopped by Sergeant Fury on March 3, 2010, including Mr. Seraphin, were from New York and were found in the western part of Pennsylvania in a rental vehicle that was not rented in any of their names and was not supposed to be driven in Pennsylvania. As explained in United States v. Martinez, 2010 WL 3614215 (D.N.J.): "although mere presence is insufficient to support a conviction for conspiracy, as Defendant vehemently points out, the jury was certainly permitted to consider Defendant's presence as a probative factor in determining whether [he] knowingly

and intentionally participated in a criminal scheme." Id. at *4 (citing United States v. Hernandez, 433 F.3d 1328, 1333 (11th Cir. 2005). The evidence at trial also showed that throughout the day on March 3, 2010, Richard Foster and Brent Kevin Hercules Antoine used counterfeit credit cards at five (5) Walmarts, nine (9) Giant Eagles, and two (2) GetGos throughout western Pennsylvania to purchase and attempt to purchase gift cards and other merchandise. Further, a reasonable inference from the testimony viewed in the light most favorable to the government was that Mr. Seraphin was present in the minivan throughout the day on March 3, 2010 as Foster and Antoine used the counterfeit credit cards to purchase and attempt to purchase these items, and when the thirty-seven counterfeit credit cards and the gift cards purchased with these counterfeit credit cards were placed in the safe in the minivan. Additionally, Sergeant Fury testified that: (1) when he stopped the minivan, the safe containing the counterfeit credit cards and gift cards purchased with the counterfeit credit cards was located next to where Seraphin was seated in the van; (2) when he asked if the safe in the minivan belonged to anyone, no one, including Mr. Seraphin, responded to his inquiry; (3) when the four men exited the minivan, having been told that the van was going to be inventoried and towed, it was Mr. Seraphin who went to the back of the minivan and removed a fairly large duffel bag, the only piece of luggage in the car that day; and (4) the duffel bag removed by Mr. Seraphin that was large enough to hold the merchandise that had been purchased by Foster and Antoine throughout the day on March 3, 2010 using counterfeit credit cards. Finally, there was Special Agent Ferris's testimony with respect to the Peace Bridge traffic stop in November, 2010 when Mr. Seraphin was found in a car along with Mr. Gardiner and another individual, Mark Daniel, which contained counterfeit credit cards, gift cards, unwrapped merchandise, and a map of Walmart locations in Western New York.

Having concluded that viewing the evidence in the light most favorable to the Government there was substantial evidence from which a rational trier of fact could have found beyond a reasonable doubt that Mr. Seraphin knowingly and intentionally participated in the conspiracy charged in the Superseding Indictment, we will deny Defendant's renewed motion for judgment of acquittal with respect to the conspiracy charge filed against him.

B. Counts 2 - 5 of Superseding Indictment: possession of fifteen or more counterfeit or unauthorized access devices and aggravated identity theft.

With respect to the remaining charges brought against him in the Superseding Indictment, possession of fifteen or more counterfeit or unauthorized access devices (Count Two of the Superseding Indictment) and aggravated identity theft (Counts Three through Five of the Superseding Indictment), Mr. Seraphin argues in support of his renewed motion for judgment of acquittal that a rational jury could not have concluded beyond a reasonable doubt that he had committed these offenses because: (1) "[t]he government produced absolutely no evidence to demonstrate that Mr. Seraphin produced, used or trafficked in counterfeit access devices or unauthorized access devices;" (2) the government did not present any evidence that Mr. Seraphin actually possessed counterfeit or unauthorized access devices; (3) Mr. Seraphin's presence in the minivan at the same time as the secured safe that contained counterfeit credit cards and gift cards does not establish that he had constructive possession of these items; and (4) his conviction for these substantive counts cannot be based on the *Pinkerton* doctrine because the government failed to establish that he was a part of the conspiracy. Renewed Motion, ¶¶72-82. In further support of his argument that the government's evidence regarding his possession of the items found in the locked safe was insufficient to support his conviction, Mr. Seraphin states:

> The government failed to establish anything more than Mr. Seraphin's mere presence in a vehicle where a secured safe/ lock box was located. There was no evidence of Mr. Seraphin having any dominion or control over or access to the

34

safe/lock box. In fact, the only evidence on that issue demonstrated that he had no control or access. He made no claims to it. It was locked, and there was no evidence that he had a key or other ability to access its contents. Moreover, there is no evidence that Mr. Seraphin actually did access it.

Id. at ¶ 80.

In response, the government first contends that there was sufficient evidence presented to the jury for a rational jury to conclude that Mr. Seraphin knowingly possessed fifteen or more counterfeit or unauthorized access devices and possessed the means of identification of Gerald Golis, Mark Cotton and Garrie Fanning. United States' Response, pp. 13-14, and 17. Second, the Government argues that the defense's legal contention that the government must prove that Mr. Seraphin both possessed, produced and used counterfeit access devices or unauthorized access devices, is in error, that "[i]n order to convict a defendant of aggravated identity theft, the government must prove that during and in relation to an enumerated felony (here, access device fraud), the defendant either knowingly transferred, possessed or used the means of identification of another person, and that the defendant knew the means of identification belonged to an actual person," and that it did produce such evidence to the jury in that "since the jury concluded that Seraphin possessed the counterfeit credit cards, sufficient evidence was therefore presented that Seraphin must have possessed the means of identification of ... Golis, Cotton and Fanning in Counts 3, 4, and 5." Id. at pp. 15-17. Finally, the government contends that there was sufficient evidence presented to the jury for it to find Mr. Seraphin guilty of knowingly possessing fifteen or more counterfeit or unauthorized access devices and aggravated identity theft under the "Pinkerton" theory of criminal culpability based upon the substantive crimes committed by Foster and Antoine. Id. at pp. 14, 15-19.

*1. Evidence that demonstrated that Mr. Seraphin produced, used or trafficked in counterfeit access devices or unauthorized access devices.*

First, with respect to Mr. Seraphin's contention, that "as to the substantive charge of access device fraud in Count Two of the Superseding Indictment, the government had the burden to establish that Mr. Seraphin knowingly and with intent to defraud produced, used or trafficked one or more counterfeit access devices or unauthorized access devices," and that it failed to produce any evidence "to demonstrate that Mr. Seraphin produced, used or trafficked in counterfeit access devices or unauthorized access devices," we disagree with Mr. Seraphin's legal contention. The elements of the crime charged in Count Two of the Superseding Indictment, violation of 18 U.S.C. § 1029(a)(3), are (1) that the defendant knowingly possessed fifteen or more access devices; (2) that the defendant knew that the devices were counterfeit or unauthorized; (3) that the defendant possessed these devices with intent to defraud; and (4) that the defendant's conduct affected interstate or foreign commerce.

*2. Mr. Seraphin's possession of fifteen or more counterfeit or unauthorized access devices and of the means of identification of Gerald Golis, Mark Cotton and Garrie Fanning.*

Turning next to Mr. Seraphin's contention that the Government failed to produce sufficient evidence that he possessed fifteen or more counterfeit or unauthorized access devices and the means of identification of Gerald Golis, Mark Cotton and Garrie Fanning, the Government was entitled to prove Mr. Seraphin's knowing possession of fifteen or more counterfeit or unauthorized access devices and of the means of identification of Gerald Golis, Mark Cotton and Garrie Fanning, just as in the case of illegal possession of weapons or drugs, by establishing that he actually or constructively possessed the items. That said, it is well established that "mere proximity to the [item], or mere presence on the property where it is

36

located or mere association with the person who does control the [item] or the property, is insufficient" to establish dominion and control for purposes of constructive possession. United States v. Brown, 3 F.3d 673, 680 (3d Cir. 1993).

With respect to Mr. Seraphin, the government's theory with respect to his possession of the counterfeit credit cards and unauthorized gift cards and of the means of identification of Golis, Cotton, and Fanning is based on Mr. Seraphin's actual possession of, or his ability to exercise control over, i.e. constructive possession of, the counterfeit credit cards and unauthorized gift cards that were located in the locked safe in the minivan next to where Mr. Seraphin was seated. Government's Response, pp. 13-14. Viewing the evidence in the light most favorable to the government, having already concluded that Mr. Seraphin was a participant in the conspiracy, based on Sergeant Fury's testimony that when he stopped the minivan, the safe containing the counterfeit credit cards and unauthorized was located in the van next to where Mr. Seraphin was seated, a rational jury could further have concluded that Mr. Seraphin had been in the minivan all day and knew there were counterfeit credit cards and unauthorized gift cards in the safe. Moreover, viewing the evidence in the light most favorable to the government, we find that there was sufficient evidence introduced at the trial from which a rational jury could have found, beyond a reasonable doubt, that the counterfeit credit cards, the unauthorized gift cards, and the means of identification of Golis, Cotton, and Fanning found in the locked safe left in the minivan on March 3, 2010 were with Mr. Seraphin's control and therefore, he possessed them.

### 3. Applicability of Pinkerton Doctrine.

With respect to Mr. Seraphin's contention that his conviction for the substantive counts contained in Counts Two through Five of the Superseding Indictment must fail because these

convictions cannot be based on the *Pinkerton* doctrine of culpability given the government's failure to establish that he was a part of the conspiracy, we disagree.

> In <u>U.S. v. Lopez</u>, 271 F.3d 472 (3d Cir. 2001), the appellate court explained:

> In <u>Pinkerton v. United States</u>, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), the Supreme Court held that the criminal act of one conspirator in furtherance of the conspiracy is "attributable to the other[ ] [conspirators] for the purpose of holding them responsible for the substantive offense." *Id.* at 647, 66 S.Ct. 1180. This aspect of Pinkerton, commonly referred to as the Pinkerton theory of liability or the Pinkerton doctrine, permits the government to prove the guilt of one defendant through the acts of another committed within the scope of and in furtherance of a conspiracy of which the defendant was a member, provided the acts are reasonably foreseeable as a necessary or natural consequence of the conspiracy. *Id.* at 647–48.

<u>Id</u>. at 480. For the reasons stated above, we have already concluded that viewing the evidence in the light most favorable to the United States, there was substantial evidence from which a rational trier of fact could have found beyond a reasonable doubt that Mr. Seraphin knowingly and intentionally participated in the conspiracy charged in the Superseding Indictment. Accordingly, viewing the evidence in the light most favorable to the government, a rational jury could have found Mr. Seraphin guilty of the charges brought against him for possession of counterfeit or unauthorized access devices and aggravated identity theft based upon a *Pinkerton* doctrine of culpability, i.e. their concluding that while Mr. Seraphin was a member of the conspiracy charged in the Superseding Indictment, Mr. Foster and/or Mr. Antoine committed the offenses charged in Counts Two through Five of the Superseding Indictment, by committing each of the elements of those offenses, that Mr. Foster or Mr. Antoine committed these offenses within the scope of the unlawful agreement and to help further or achieve the objectives of the conspiracy, and that these offenses were reasonably foreseeable to or reasonably anticipated by Mr. Seraphin as a necessary or natural consequence of the unlawful agreement.

For these reasons, Defendant Seraphin's renewed motion for judgment of acquittal must be denied with respect to the charges filed against him in Counts Two through Five of the Superseding Indictment.

## ORDER

AND NOW, this **22**nd day of August, 2013, it is HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant Jean Seraphin's "Renewal of Motion for Judgment of Acquittal Pursuant to Fed.R.Crim.P. 29" is DENIED. An Order Setting Sentencing Hearing shall be issued FORTHWITH.

Maurice B. Cohill, Jr.
Senior District Court Judge